Begin directly with 212483 Wilford v. United Airlines. Counsel, when you're ready, you may proceed. Thank you, Your Honor. May it please the Court, my name is Melissa Kelly, and I represent the appellant, Celeste Wilford, in this case. The question before the Court today is whether the District Court erred when it granted United Airlines summary judgment in its favor against Ms. Wilford. And the answer to that question is yes. Ms. Wilford's main point on appeal today is that the District Court incorrectly concluded that there was no genuine dispute of fact about whether United's stated reason for terminating her was pretext for discrimination. Now, the standard for summary judgment is a familiar one. As the non-moving party, Ms. Wilford was entitled to the benefit of all permissible factual inferences and ambiguities. And this Court has repeatedly recognized that a party claiming discrimination or retaliation can demonstrate pretext indirectly by showing that the employer's proffered reason for the discriminatory act is unworthy of credence. Ms. Wilford also didn't have to point to just one single piece of evidence to show pretext. Instead, as the late Judge Hall of this Court wrote in the Walsh case that we cite in our briefing, she could build a wall out of evidentiary bricks. And that's exactly what she did here. But the District Court paid no heed to that evidence, and that was its error. The most glaring evidence of discrimination in this case is Mr. Waterman's comment to Ms. Wilford when he called to tell her that her emergency transfer request had been denied. He was her supervisor. He told her if she wanted to take time off to be a mother, she should find another job. The District Court determined that that comment was sufficient to satisfy the prima facie case of discrimination. But then it ignored it and other evidence related to Mr. Waterman when it was making its pretext, when Judge Daniels was making his pretext determination. And that was error, because Ms. Wilford can rely upon the same evidence to show pretext that she relied upon to establish a prima facie case. And it was error that merits reversal, because the record is replete with evidence upon which a jury could conclude. The prima facie case burden, as you point out, is very light. It is, Your Honor. But when you get to pretext, I think you have a heavier burden. You can use the same evidence. Certainly. But it doesn't necessarily have the same decisive weight. You're absolutely right, Judge Jacobs. But in this case, it wasn't just that comment. It was that comment plus the other evidence in the record that was sufficient to allow a jury to conclude that what happened to Ms. Wilford was the product of discrimination, was that United States' stated reason was a pretext for discrimination. And that evidence was not only Mr. Waterman's comment, but also the fact that the very month after he told her that she should quit if she wanted to be a mother, he was part of the decision to instigate an investigation that ultimately culminated in her termination. He conducted that investigation. He was the only person that Ms. Wilford spoke to about the United States' allegation that she was lying. He wasn't the decision-maker. You are absolutely correct. What's the weight of the fact that he conducted the investigation if the decision-maker is someone else? There's law on this. I'm sorry, I couldn't hear the question. There's some law on this. There absolutely is. The cases that we cite in our briefing, Bickerstaff, Raha Javar, Avima, I'm probably incorrectly pronouncing that. That's a Connecticut case. There is plenty of law in the Southern District of New York and in the Second Circuit that says that the fact that the discriminatory animus did not belong to the ultimate decision-maker does not preclude a finding of pretext where someone who did have discriminatory animus was involved in the investigation. I think you still under those cases have to show a causal link between the discriminatory, the evidence of discriminatory intent, conduct, and the adverse employment action. And if you could walk through what you think is available here for a jury to conclude that that link exists. Certainly. Thank you, Judge Bainton. Absolutely. So during the course of the investigation, Ms. Wilford offered medical evidence to substantiate her explanation for the fact that at the end of the day on December 30th, she called to invoke FMLA leave, her approved intermittent FMLA leave, because of her shoulder condition. And then the next morning, woke up and felt well enough to work, saw that United needed assistance, and called in and offered to work. And she offered to Mr. Waterman during his investigation to provide statements from various physicians to substantiate what she told him. He wouldn't accept it. He didn't accept it, and he didn't go through United. Ms. Panos, who conducted the, who was the decision-maker. Certainly. I understood, but tell me if I'm wrong, did accept evidence as part of the hearing record. Her testimony about what she did without medical evidence is actually far from clear. She testified during her deposition. She said various things. She said at one point she received it. She said at one point it was forced on her. She never came out and said, I accepted it, I reviewed it. And, in fact, she acknowledged that because of Waterman not obtaining the evidence, sending it to United's medical department, where it would be reviewed, and most likely Ms. Wolford would have undergone FMLA recertification. Instead of doing that, well, because he didn't do that, Ms. Panos' testimony was not clear about whether she actually could accept it, did accept it, did review it, took it into consideration. If you look at our briefing, pages 27 to 28, we talk about the lack of clarity in her deposition testimony. And the point, of course, is that a jury could listen to Panos' testimony and decide that she was either equivocating about accepting the evidence or that she really hadn't accepted the evidence. During her deposition, they asked her, they said, well, where in your letter to Ms. Wolford, terminating her, does it say that you considered her medical evidence? And all she could, the best thing that Ms. Panos could point to was a catch-all statement at the end of the letter that said, I've considered the evidence. So that would be the causal connection. One of the grounds cited by Ms. Panos for dismissing your client, terminating your client, is that she used poor judgment to return home to New York after landing from Brazil in Washington. And that put her in a position where she could not be available. She was required to be on crew out of Washington early in the morning. That is a proffered reason for firing your client. Why is it unworthy of credence? There's no regulation that required Ms. Wolford to not return home to New York City when she got home from Brazil. She lived in New York City and was based out of Dulles and did it regularly. And there's no evidence that she wasn't going to be available for a flight other than her FMLA condition. And what Ms. Wolford states in the record in this case is that she got off the flight in Dulles and she came home and she tried to treat her neck to be able to work. And when she ascertained that she wasn't going to be able to, she called the flight attendant help desk and said, you know, I've been trying to treat. I can't work. But then she was available. I'm sorry, Your Honor. But then she was available the same day. She was available after a night of rest and after treating her neck condition at home. And she woke up that next morning. So she got into New York City in the evening of December 30th, was experiencing significant neck pain because of the FMLA-approved condition that she was already approved for, united. Treated, got some rest because a significant problem that she's caused because of her neck condition is she gets tired. She gets exhausted. She can't rest on the flight. Let me ask you this. This may not be in the record, but she said she didn't have any sleep for several nights. Isn't there some regulation that a crew should not fly if they are exhausted or if they are not alert? I'm certain that there is, Your Honor, and I apologize. I'm not familiar with that. But I know that one of her concerns was – and I'm talking over you. I apologize. There was nothing about this in the record. There's nothing about the regulation about the amount of rest a flight attendant needs to have. But what we have in this case is evidence that she was tired because of her neck condition, and that's what she told the individual when she called in. But the factor of fact could find it odd that if she was exhausted, then landing in Washington, what the next thing she would do is take another flight to New York. I mean, I'm sure if you work for an airline, you fly a lot. But, I mean, if you're exhausted, the last thing you could think about doing is getting on an airplane and going to another city in order to go to sleep. A jury, I think, could conclude that she was heading home because that is where her medical treatment was available. She lived in New York City. She was treating with physicians there. And United made a lot of this fact in the trial court. Her husband is a pain management physician, and he was in New York. And so she could get home to him, and barring availability from her other physicians, she could at least get some treatment from him. Thank you. And I apologize. I've gone over my time. Well, thank you, Ms. Kelly. You have two minutes remaining for rebuttal. Okay. We'll hear from opposing counsel. Thank you. You may proceed when you're ready, counsel. Thank you, Your Honors. I just wanted to note the procedural posture of this first because some of the evidence moved around from one claim to another between the summary judgment and the appellate phase of this litigation. At the district court, United moved for dismissal as to all claims, gender and disability discrimination claims, as well as FMLA interference and retaliation claims. The disability discrimination and reasonable accommodation claims were dropped from the appeal, along with the FMLA interference claim. The remaining two claims, gender discrimination and FMLA retaliation, are both, as counsel mentioned, governed by the familiar McDonnell-Douglas framework, which, of course, at the first stage requires the establishment of a prima facie case, which the judge at the gender discrimination stage found had, in fact, been met. You don't challenge that, do you? No. No. Not as to the gender discrimination claim. We actually do challenge it as to the FMLA claim, but the judge did not determine that a prima facie case had been met as to the FMLA claim. He just skipped over it and went straight to pretext to determine that no pretext had been established. So I'll address the gender discrimination case briefly first. The claims counsel cited Walsh, the Bricklayer case. And Walsh is an interesting case, and it does certainly reflect the law of this circuit, which is that you can create a wall of pretext out of separate evidentiary bricks. The problem with this case is there's only one brick. There has only ever been one brick. The other bricks identified by plaintiffs are alleged acts, grievances that aren't actual evidence of discrimination. And that's something that Judge Daniels highlighted not only in his opinion but during the three-hour-long oral argument. He kept going back to, but how is that evidence of discrimination? How is that evidence of retaliation? In the gender discrimination claim, there are— I take it that that one brick was the statement, if you want to—essentially, if you want to be a mother, don't be a father. That's correct. The one brick is the statement allegedly made by her supervisor, Wynne Waterman, in connection with a different application. It's interesting. You say allegedly. Is there any question that he made it? Not for purpose of this appeal. Of course, we're contesting it in the case. But for purpose of this appeal, of course, the court has to determine that the claim— That's fine. Yes. And our—what we're claiming is that, yes, of course, we concur with the court. That may have been enough to establish the minimal prima facie burden. However, it's not enough. It's a bad brick. It's a small, weak brick made out of, if you follow the children's story tales, made out of straw instead of the stuff that bricks are supposed to be made out of. So we don't like that brick, but the point is it's still just one brick. The only other thing they cite in support of the fact that we actually had discriminatory animus is the fact of the denial of this emergency transfer request, which was made several months earlier in October. And, of course, that was a claim that was briefed to great detail. But there seems to be the claim that Waterman accused her of lying when she said she had an appointment. And she says that in that same conversation, she realized appointment sounds really misleading when, in fact, she was just going to do therapy, prescribed therapy for herself. So she corrected it immediately. And so I'm sort of taking from this the idea that Mr. Waterman skewed things by making it look as though she was lying when, in fact, she misstated and then corrected it. Well, that's the claim. I mean, her claim at that position is that, well, she did correct it. He claimed, no, she said something else. But it wasn't just about the comment she made during the telephone conversation that she later turned around and corrected. There were other claims. What do you say later? She claims it was immediately. Right, right. But the problem is if you look at her written statements, she submitted two written statements. She submitted one, I believe, on the 4th, one on the 7th, and I think one on – actually, it was an oral statement on the 4th, one on the 7th, and one on the 14th. Those oral statements also don't coincide both with the story she told Waterman and the story she told at the time she took the leave of absence, and this is absolutely critical. None of these stories make sense also. She was not able to clear any of this up during her deposition testimony, and I think that's critical. One would think that after a couple of years and some deposition preparation, the story would be clear. It is abundantly not clear, and I can refer you to her testimony at pages 284-8 to 298-10 where she talks about what she meant when she said she had a physical therapy appointment, what she really meant when she said she had a doctor's appointment, what she really meant when she said that she had a doctor's appointment in her house. But in any event, none of this really matters because the point is, does – is this court's role – Well, it does matter. If she lied, if she lied and is not reliable, that's a ground for firing somebody, especially when you're in that industry. Well, and in fact, Your Honor, the dishonesty is what led to her termination, and let me just back up a second because one thing that I wanted to be clear about is why she was fired and the fact that United's basis for her termination never changed. Plaintiff wasn't fired due to gender discrimination. She wasn't fired because she took an FMLA leave. She wasn't fired because she lied about needing an FMLA leave for her medical condition. She lied for dishonesty in violation of United's working together guidelines. She called out on FMLA and had nothing else happened, this would have ended there and we would not be here today. The problem was she misused her FMLA. She then turned around, called back in, proceeds to get into a heated verbal altercation with the in-flight services crew that were so bothered by it they reported it up the line of command, and that's how it got to Waterman. And that's another thing. Throughout this case, Waterman has been painted as the big, bad, discriminatory person. He's been the only person identified that supposedly had any discriminatory animus. But so many more people had a role in all of this. Kate Panos made the ultimate decision to terminate her employment. A different person altogether decided, along with her union, to deny that emergency transfer request, and even when they denied it, they gave her not one but two different alternatives that would put her in New York able to get that treatment. Not one, not two. And then finally, you have two different people, before it even gets to Lori Trennis, who were involved at the call phase on January 31st. But I think that the question for our purposes, because that's all a good summation argument. The question is whether there's sufficient evidence for a jury here to conclude that Waterman's discriminatory bias infected the termination decision. And that he's her supervisor, that he took the call and brought it to his supervisor to start the investigation, that he's involved in the investigation, and that he has contact and communication with Panos, as she's the decision maker. Is there enough for the jury to disbelieve the version of the story that you just told and to see that causal link between Waterman's view about working women who wish to have children and the termination decision? And there is no other evidence identified in the record besides this several months earlier call in which Mr. Waterman called the plaintiff and relayed to her the emergency transfer request denial made by somebody else that was in advance of this whole scheme of events. So in other words, it's the comment that is made in connection with something else entirely. Indisputably, that comment has nothing to do with her termination. It couldn't have had anything to do with the termination since it predated it by almost four months. Is that enough? We submit that it simply is not. It is the one single evidentiary brick that plaintiff is trying to build an entire wall around. You said four months. I think it's two months. They say it's two months. We say it's four months. It's a calendar. It's not two months. It's probably three and a half months. She made the request for an emergency transfer in October. It was denied, I believe, on November 4th. I believe she was fired on February 22nd. Yeah, but the events that provided the premise for the firing started on December 30th. It started on December 30th, but she was not placed under investigation until January. Okay. So, I mean, there certainly was some gap in time, and certainly there is no evidence indicating that he decided to target her based on that. That is just supposition. It's simply supposition. Well, we're going to attack their reasons for termination. And one other thing I wanted to note, and this is really important for me to get in while I still have a couple of minutes, it's really important to point out that United's job and their sole function is to run one of the world's largest airlines. Their job is to get customers from point A to point B safely. They admittedly have strict, very strict attendance. We learned a bit about this in following Southwest Airlines. Which was what I was about to say. Thank you, Your Honor, for stealing my thunder. They apply these rules to everybody regardless of gender. One of the reasons the rules are so strict is because a plane can't leave the gate unless it has a certain number of flight crew on board. United has these reserves to account for situations where flight attendants call out. But anyone watching the news over the last couple of weeks saw what happened. Anybody who was ushered onto a United plane in Newark and then ushered off because somebody missed the connection.  So sorry, Your Honor. So, so sorry about that, Your Honor. Yeah. When the scheduling system fails, and it's funny because at first they said it was weather. And then they said it was, and then finally they said, oh yeah, it was our scheduling system that failed. Of course it was their scheduling system that failed. It was the ability to get people, pursuant to FAA regs, on planes. Otherwise the plane can't take off. Otherwise this plane can't get to point B. And then pick up more people to get to another, which causes the snowball effect. It has to apply these rules strictly. There is no evidence. There is the single weak evidentiary brick. That is it that the plaintiff can cite for evidence that there is any kind of gender discrimination here. It does not, that alleged evidence does not relate to the termination decision in any way, shape, or form. She was granted six out of seven FMLA leaves, including two, the only FMLA leave that she was ever denied was granted ten days later when she submitted it on time. Thank you, Ms. Grisham. Thank you. All right. Ms. Kelly, you have two minutes for rebuttal. Thank you, Your Honor. I am, of course, aware how important airlines are and how important airlines following their internal rules and regulations is to their ability to function. That doesn't give them the right to engage in gender discrimination or to decide at the summary judgment stage what the facts are. At summary judgment, the trial court is supposed to decide whether a jury could reasonably conclude facts that are in favor of the plaintiff or that demonstrate that the defendant is not entitled to judgment in its favor. Is it undisputed on this record that Ms. Panos was the sole decision maker? No. No, it's not undisputed, Your Honor, because, well, let me be clear. Panos wrote the letter, Panos conducted the hearing, and Panos is the person whose name is on the letter to decide. So there's no evidence that Waterman and Panos consulted about what to do about Ms. Wilford. But there is evidence, and it's not just one evidentiary brick. There are multiple bricks that show that he was at least part of the decision to instigate the investigation. I mean, I guess it depends a little what you mean by instigate, because the investigation was the sort of starting point had nothing to do with Waterman. It was the people at the call center who received the call. There's no evidence, I don't think, that Waterman muddied the waters there in any way. That was entirely independent of Waterman, correct? So the call center individual told Waterman about the call, about Ms. Wilford's call. Independent of anything having to do with Waterman. Actually, you know, Ms. Wilford's trial counsel wasn't really able to explore that fact, because when they wanted to- There's nothing in the record from which a jury could conclude that that initial step, that starting point, was in any way the result of Mr. Waterman. The initial step, the call center person's decision to let someone know was not Waterman. The person she let know was Waterman. And Mr. Beretto, who I understand is Waterman's supervisor, consulted with Waterman, said to Mr. Beretto, I have evidence that Celeste Wilford called off sick and she's not really sick. And then they started the investigation. Panos did not adopt that finding. Panos did not credit or accept Waterman's statement that claimed that she was not ill. Well, Panos certainly accepted a lot of Mr. Waterman's- Yeah, that may be. But, I mean, you just said that Panos accepted Waterman's claim that she was not ill. And I think probably as a result of receiving that letter, that doctor's letter, Panos did not accept that. Panos accepted Mr. Waterman's conclusion that Celeste Wilford had been inaccurate or had given, you know, inaccurate reasons for invoking her FMLA leave. He made that conclusion and then Panos accepted that Ms. Wilford had not been forthcoming or honest with United when she sought to invoke her FMLA leave and then called in the next day and was willing to work. It was about her dishonesty and it was Mr. Waterman's investigation that led to Panos' hearing and led to the conclusion from Ms. Panos that she should be terminated. Mr. Waterman's fingerprints are all over that investigation. He was large throughout it. So even if Ms. Panos was ultimately the decision maker who made the decision to terminate her, she was given information that Mr. Waterman had gathered after making a discriminatory comment the very month before he started the investigation. There's no confusion in this record about the time span. He called Ms. Wilford on November 4th and said, if you want to be a mother, you should find a different job. And then at the end of the very next month, the investigation, the events that led to the investigation started. The end of the very next month, that's two months later, November 4th. Certainly, but it's not four months. I'm sorry, Your Honor. It's hard to argue the chronology. Yeah, because the chronology is very clear, Your Honor. He calls her on November 4th and says the discriminatory comment. December 31st, they start investigating her. And if we want to quibble about four days in January, that's fine. The beginning of January, they start investigating her, and that investigation culminates in her termination. They want to forget that it's Waterman engaging in the investigation and Waterman who had made that comment. All right. Thank you, counsel. I'm way over my time. I would just respectfully ask that this court reverse the decision granting United Summary judgment in its favor. Thank you very much. Thank you to both counsel for their helpful argument and briefing. The matter is submitted.